Good morning, Your Honors, and may it please the Court. My name is Bruce Ortega, Deputy Attorney General, representing the Warden, in our appeal from the District Court's grant of habeas relief to Petitioner Marvin Walker in this case. In our view, the California Supreme Court did not unreasonably apply Strickland v. Washington in rejecting the claim that Petitioner was prejudiced by his trial counsel's deficient performance in failing to object to the knee brace that Mr. Walker was forced to wear during his capital trial. As this Court is aware, after Cullen v. Penholster, review under Section 2254 is limited to the record that was before the California Supreme Court at the time it adjudicated the merits of the Strickland claim. In our view, that record before the California Supreme Court establishes, in the words of Harrington v. Richter, a reasonable basis for the California Supreme Court to have concluded that there was no reasonable probability that but for counsel's unprofessional errors in failing to object to the knee brace, that the results of the guilt and the penalty phase would have been different. What is the effect of the stipulation you entered into in District Court? That was for purposes of an evidentiary hearing, Your Honor. And after Cullen v. Penholster, my understanding of this Court's precedent is those facts that we stipulated to that were not part of the California Supreme Court record could not be examined by this Court for purposes of evaluating the reasonableness of the California Supreme Court's decision. And in essence, there were only four. Counsel, does that same rule apply to a stipulation as it would to a contested evidentiary hearing? I don't think there's no difference, Your Honor. Under Cullen v. Penholster, it's the record before the California Supreme Court. The District Court ordered an evidentiary hearing. We stipulated to facts and evidence for the Court to hold that evidentiary hearing. Subsequent to that, or she ruled, she granted habeas relief. Subsequent to that, Cullen v. Penholster issued, stating, as I mentioned, that the record is limited to the what's before the California Supreme Court. I want to make sure I'm clear. It's your view that we can take no notice of that stipulation, consider it in no way, shape or form? That's not correct, Your Honor. Only to the four areas in which we stipulated to facts before Judge Armstrong that were not before the California Supreme Court. So which facts do you – specifically, what is it you don't want us to think about? Okay. Well, one of them is irrelevant because it only dealt with a deficient performance, and that was the stipulated testimony of the Strickland expert. There were three areas with respect to prejudice. That is, it was not before the California Supreme Court, the specifics of the knee brace, which we stipulated to in this Court. The second area – So we cannot consider the specifics of the knee brace? The – okay. And the second area is the April 22, 2009 deposition testimony from trial counsel, which didn't enter into the decision at all from Judge Armstrong. And third and last, the stipulation that the trial prosecutor had no recollection as to why he asked the particular question that led to the entire jury becoming aware of the knee brace. So in our view, even though the jury – So we can't consider those things in the stipulation? I believe that's correct. Can we consider the fact that the juror – what the jurors said about the knee brace? Correct. That was all in front of the California Supreme Court. Okay. Now, let me acknowledge initially when I – when I say that we maintain the position that the record before the California Supreme Court would allow that court to objectively, reasonably find no prejudice from deficient performance, I recognize the following facts, that Mr. Walker had to wear the knee brace every day, that five jurors declared either that they saw the knee brace or became aware of it, and that on the 16th day of this 25-day trial, the entire jury became aware of it, that it caused Mr. Walker to limp in court, including to and from the witness stand, that it was uncomfortable and distracting for Mr. Walker and led to an exchange with the deputy sheriff that culminated with the sheriff putting handcuffs on Mr. Walker in front of the jury. We recognize that he was charged with violent crimes, and we recognize that Deck v. Missouri notes the inherent prejudice that flows from Shacklin in that it can impact the jury's perception of the defendant and the presumption of innocence. But Deck nevertheless states that Shacklin is susceptible to harmless error analysis. So I admit that there are facts from which a reasonable judge could find relief. I admit and acknowledge on this record Mr. Walker did not receive the respectful treatment to which he was entitled when he had to wear this knee brace without a record finding of necessity. But nevertheless, we believe there are factors before the Supreme Court viewed cumulatively that render the rejection of the Strickland claim on nonprejudiced grounds objectively reasonable. And the first is the restraint itself. The record before the California Supreme Court was that it was worn under his pants, designed to impair mobility. Now, I acknowledge it caused him to limp. I acknowledge that it caused him pain and distraction. But nevertheless, it is not as obtrusive as, say, waist chains, leg irons, handcuffs, a gag, so I believe the California Supreme Court could have reasonably found that this restraint was less likely to have impacted the presumption of innocence or led them to conclude that there was an appearance of dangerousness. I would also point out that we know that when the shackle was brought to the intention of the entire jury through a question of the prosecutor to the petitioner's girlfriend, that the Court referred to the shackle as the knee restraint that the In our view, this statement would have suggested to the jury that all in custody defendants are so restrained and therefore negated any inference that Mr. Walker posed some exceptional danger. And although the Court gave no curative or limiting instructions regarding the knee brace, it did give, at the conclusion of the guilt phase, standard instructions from which the California Supreme Court could have concluded the jury would not have brought the knee brace into its deliberations. The first is that the jury had to decide this case based on the facts and the law, and that the jury was determined the facts of the case from the evidence and no other source. The Court instructed the jury that evidence consists of testimony of witnesses, writings, material objects, or anything presented to the senses and offered to prove the existence or nonexistence of a fact. The Court instructed the jury that the fact that the petitioner was arrested and brought to trial was not evidence of guilt, and that the jury could not factor things like passion or prejudice into their verdict, and that petitioner was presumed innocent, and that the prosecutor had the burden of proof beyond a reasonable doubt. Now, I understand Petitioner's argument is these standard instructions can't enter into or have limited probative value with respect to a prejudice analysis, because if they did, there would never be prejudice from shackling because these instructions are given in every case. My response is twofold. One, I'm not arguing that it's the instructions alone that render the California  I'm arguing that Petitioner is not innocent. And I would offer that in this case, the jury acquitted Petitioner of one of the eight counts, which leads me to believe, and the California Supreme Court, too, objectively concluded that they upheld the presumption of innocence. It seems to me that acquittal is inconsistent with the conclusion that the knee brace essentially branded Mr. Walker as having a violent nature and thereby undermined the presumption of innocence. Finally, what about the evidence? As we know from this Court's decisions with respect to Strickland and also shackling, the strength of the evidence is something that can be factored into the conclusion. Counsel, that makes a lot of sense at the guilt phase, the strength of the evidence. But I'd like you to separately consider for us the penalty phase, because the jury's task at the guilt phase is to find something that is objective in nature. Did the government prove beyond a reasonable doubt that this defendant did certain acts on certain days? But the jury is called on to make a different kind of judgment at the penalty phase, where any factor can allow a jury to show mercy. And so it isn't really overwhelming showing of guilt. I'm not sure how that plays at the penalty phase. And the presumption of innocence that you were talking about no longer applies. So why is it not prejudicial at the penalty phase? Certainly. Your Honor's question I think goes directly to one of Judge Armstrong's holdings, which was that the brace essentially made correct one of the aggravating factors, future violence. My response would be the jury already knew that this knee brace was put on all prisoners or all in custody defendants from the guilt phase. So I think the California Supreme Court could have reasonably concluded that the jury then suddenly, when it gets to the penalty phase, would think that this knee brace is something they could factor in to their normative decision with respect to life or death. I would also argue that the prosecutor at no point referenced the knee brace or stated that that was something that the jury could consider in making its determination. So my argument would be I think the California Supreme Court could reasonably look at this record and believe that the knee brace was not something that was brought into the jury room for purposes of their penalty deliberation. And secondly, one thing the California Supreme Court did articulate with respect to a penalty phase issue, when there was some of the penalty phase evidence was found to have been inadmissible, they found it harmless in part from what they called the overwhelming nature of the aggravating evidence, the execution-style shooting of two victims and then later the attack on Ms. Olveda. There were, however, a fair number of mitigating circumstances as well. And if the jury found it to be close, I guess I worry about that. Certainly, Your Honor. If ‑‑ I have to be frank, I think, to maintain my credibility. If this Court were to find that this evidence on aggravating and mitigating were close under the precedents, it would have to issue with respect to penalty. This Court's precedents make clear that it needs to have overwhelming evidence, and I think that would have to go to the aggravating evidence. If this Court could not conclude that the California Supreme Court correctly found that the aggravating evidence was overwhelming, then I would be constrained to admit that the district court's penalty determination would have to be upheld. But I think that this Court can look to the record before the California Supreme Court and can conclude that it's not objectively unreasonable to find a lack of prejudice at the penalty phase from the shackle. It's a close case, but under our standard of review, the State court prevails. Well, I feel as if in this case we're running into something that we run into, unfortunately, regularly, which is somewhat conflicting signals from recent Supreme Court cases. On the one hand, there's been a huge emphasis, as you point out, on deference to the State court. On the other hand, in some cases, the court has expressed increasing discomfort with the application of the death penalty, and I'm not sure how those two strands of cases fit together. Do you comment on that? All I can comment on, Your Honor, is that we are viewing this through a Strickland lens, because it comes to us from ineffective assistance of counsel. So we have to evaluate whether the California Supreme Court objectively ruled that there was no reasonable likelihood of a different result at penalty from trial counsel's failure to object to the knee brace. And when we're looking at different result, do we look at the prospect of at least one juror concluding that death is not warranted, as distinct from the whole jury having to be so persuaded? Yes, Your Honor. It's the latter. As the district court concluded, if at least one juror impermissibly considered the shackle of evidence that Petitioner had indeed committed the DA threat, then that's enough. So this – if this Court were to conclude that it believed one juror may have gone for life without parole as opposed to death, but for the knee brace, then as I stated, I would be constrained to concede that the penalty writ must issue. I note that I didn't reserve any time, unless the Court has any questions. You're welcome to reserve whatever you'd like. Okay. I'll reserve the remainder of my time. Thank you. Thank you very much, Mr. Ortega. Mr. Walker. Good morning. Good morning. Thomas Mayhew and Doug Young with me from Forell, Lebron, and Martel. I'm going to address the guilt phase and basic standards. Mr. Young will answer questions about penalty. I want to start with this idea about the strength of the case at the guilt phase. This is a case that could have gone either way and in which Shackling has a reasonable probability of affecting the judgment of at least one juror. We can see this, and the district court correctly found this, not just because of what the actual evidence was, and that's something that the district court took into account and you should too, but also how the jury reacted to it. It's critically important and I think shows that this isn't just a case where this court or the district court can find that there was strickland prejudice, but also that this is one that's truly over the line. If it's so powerful that they'd be blinded by it, how do you account for the acquittal on the assault on the customer who came into the liquor store? I think that with no evidence of which of the two robbers hit Mr. Guerrero, I would, you know, it would be shocking if the jury came back any other way on the assault, there was no evidence of which of the two robbers hit Mr. Guerrero. So I don't think that that helps tell you that this jury wasn't influenced by the Shackle when it came to the more critical question where they did convict, which is this question of, okay, was Mr. Walker there, because that was the defense. This was an identity case. Was Mr. Walker there? And on that question, for the bottle shop robbery, you had, first you had Mr. Romero. You did not have, as the State argues and as the California Supreme Court incorrectly stated, you didn't have two eyewitnesses on this point. You had one. You had Romero. Mr. Romero, when he was shown a photo lineup, he was shown a number of photo lineups, frankly, and he came back and he said, I can't see the person who was there. You also have the sale of the murder weapon with the statement from your client. I can go right there. And so the question is, did Mr. Walker have the gun that day? And the only evidence on that is his own statements. And his statements were, frankly, all over the place. His main statements were that he'd had it for a long time and it had been, I'm paraphrasing obviously, and it had been used to commit a murder. Yes. He did tell the undercover cop that this gun had been used in a murder, one in Salinas, which the prosecution disproved. Which didn't exist. And there was no murder in Salinas. This was, yes, he was all over the place about the gun. He talked about how some punk got in the way and he took him out of the game. That wasn't true either. What you're saying is he has no good explanation for having the murder weapon, I think is what you're saying. I think that the jury could have disbelieved him in one of two ways. They could have said that he was covering up a crime, that he was the murderer, that he had had the gun at the time and he had been involved in the shooting. I think that the jury could also, and this is the question on reasonable doubt, could the jury have had reasonable doubt? And on that point, they could have said, you know what, this is a scared kid. He's talking about the Ice family. He's talking about concern about his family. He seems reluctant to identify who it was who had this gun at various points in time. And so we're just really not sure. And the way that you can tell that they were really not sure is that they voted. They voted. They, you know, if it were an overwhelming case, when they go back in the jury room, they say, let's take a vote, you know, find out where everybody is. If everybody raises your hand for guilt, the jury can, this is, they don't review a cold record. They are there. They see the strength of thy witness testimony. They heard Mr. Walker. They listened to his conflicting stories. They heard the evidence about the gun. And unlike an appellate judge who looks at a cold record and says, well, this seems awfully strong to me, the jury reacted to this evidence, and some of them said guilty, and others raised their hand and said not guilty after hearing all of the evidence at trial. And so to call this an overwhelming case when we know that the jury was in doubt, when we know that they were asking for re-instruction on reasonable doubt, when we know that the readback, the first readback that they asked for was testimony about the identity of the robber from Romero, we know that they were divided, we know that they saw it as a case which very much raised issues of reasonable doubt, yes, the gun evidence was bad. It was bad enough that I think you could say that the evidence was sufficient to justify a conviction. But this isn't a sufficiency of evidence issue. This is what is at stake. Sotomayor, this isn't the argument that you're just making a cut against your own claim, because if jurors were comfortable enough with your client to consider a not-guilty vote and to go through all of the very careful deliberation that such a case deserves, doesn't that suggest that they were not swayed by or that it was reasonable for the California Supreme Court to conclude that they were not swayed by knowledge of the leg brace? I think that to say that the brace made no difference, that it doesn't sway jurors, the California Supreme Court couldn't write that opinion without disregarding what the U.S. Supreme Court had said over and over again, which is that it absolutely has a prejudicial impact. Well, it can. If you have visible evidence. There is a – but you have to concede that there is a prejudice inquiry. The error can be harmless. The error can be harmless. Okay. So back to my question, if we have a jury that is acting as carefully as you have just described and with as much concern about reaching a guilty verdict as you have described, doesn't that describe a jury that the California Supreme Court reasonably conclude was not inappropriately swayed in this particular instance? I don't think that there's anything about the fact that jurors voted not guilty that suggests that the shackle didn't make a difference. I think that that's – I think that that would be an unreasonable speculation if that's what the California Supreme Court thought. I think it would be an unreasonable speculation in part because the U.S. Supreme Court says that shackles are inherently prejudicial. I think if you look at the range of case law and – But see, you know, I guess my concern is if you – if you had come in here and you'd said, well, we concede that it was completely prejudicial because they all voted to convict after 11 minutes and they didn't pay any attention to the instructions, we don't know that they really even listened to the evidence, that seems to me it would be a much stronger case than what you're presenting now, which is to say, well, let's hear that evidence again. Let's hear those instructions again. We're not sure yet. Doesn't that suggest a jury that's not been unfairly swayed? Particularly when you couple it with the acquittal on the other kind. I think the way I come at it is this. If you look at the range of cases in which courts have allowed a verdict to stand when there's shackling, and you look at what categories, that range of reasonableness that's been expressed by this Court's precedents in courts all over the country, you see that there – it falls within a number of neat categories, really. There are the cases where shackling was justified by some – you know, there was record evidence showing why shackling was justified. You can say that it's not – not harmful there. Where the shackle isn't visible, most of the non-prejudice cases come down on visibility of the shackle. Did the jury know about it? Here we know they absolutely know about it. The prosecutor called it to their attention. We've got five juror declarations from 10 years later say they saw it. And the Court says that visible unjustified shackling, the U.S. Supreme Court says visible unjustified shackling is inherently prejudicial. Now, there is – Do you think it makes any difference if it's shackled? I'm sorry? Do you think it makes any difference? I mean, if he came into court with a ball and chain and his hands tied to a belly chain and that sort of thing. I think that's a good question. That's one kind of shackle, yeah. This one was under his clothing. The judge, as Mr. Ortega points out, apparently told the jury this was more or less a routine measure for people in custody, and I wouldn't call it a full-blown curative instruction, but it – you know, you would take the judge's comments to be indicative of custody and not dangerousness. He was able to use his hands. He wasn't constrained from, you know, moving his arms and so forth, the way you might chain somebody who you think is going to do something dangerous. I mean, not all shackles are the same is what I'm getting at. It's true that not all shackles are the same. I think all shackles, ones that the jury sees, communicate the same thing. When you say they see it, what did they see? Did they see the device? It was under his clothing. Because we ended up not having evidence, Your Honor, I don't know whether it was that they saw, you know, when somebody's sitting, whether, you know, your leg, your pant leg rides up a little. In our State court petition, we alleged that it was – and this is what the California Supreme Court accepted as true, that it caused him to sit in an unnatural position throughout the trial and also that it caused substantial discomfort. Well, they knew he wore a brace, but I'm not clear that they actually saw the device. We have five jurors who said they did. But they have x-ray vision? I mean, how did they see through his clothes? I'm sorry. How did they see through his clothes? It could be that they saw at the – that they saw the bottom of the shackle. How far did it go down? Does the record show? I don't know that the – I don't know that the record shows, and as Mr. Ortega points out, ultimately, you look at what the California Supreme Court looked at, and – Counsel, Judge Gould, if I could interject a question, a slight change of this focus just for a minute. In assessing the prejudice issue on the shackles, we obviously have to think about the strongest evidence of guilt and the strongest evidence that would have raised the doubt about guilt as to your part of this argument. So I guess I'd like to know from your perspective, what were the two or three strongest pieces of evidence in front of the jury that would have raised doubt, raised a reasonable doubt as to whether he was guilty of the offenses for which he was convicted? And what are, let's say, the one or two strongest points that would have gone the other way that you have to answer? I would say that on the bottle shop offense, the – one of the strongest points raising doubt about identity was that there was this issue with the car, that the car was a 1960 to 65 two-door Chevy Nova. Mr. Walker instead had a different color. He had a – instead of a rust or tan color, he had a yellow 1967 Rambler. When they brought Walker's very car back to the apartment building, they had the witness stand in the same balcony where he had stood on the night of the offense and look down at the car, and he said, it's a somewhat different car. I think that that raises doubt as to identity. It may be why some of the jurors were in doubt for some substantial period of time. Ultimately, they were persuaded, but that's the question, is whether the shackle made a difference by making just a little bit easier to overcome that doubt. On the Olveda offense, the Olveda offense identification evidence was very weak, and the prosecutor conceded that it was weak. It was – she couldn't see his eyebrows or his hair. She couldn't see the bottom of his nose or the bottom of his face. She didn't identify a scar on his nose. She couldn't identify him from a photo lineup. She went to the in-person identification and looked at him for 15 minutes. And after 15 minutes, when she checked the box on the card, she marked possible, not positive. And it was only after the sheriff said, you know, here's what – here's what that means, that she thought about it for a long time. Those are her words. And she changed her – changed her answer. I think that that raises reasonable doubt about the Olveda offense. And importantly, I think that if you find that the California Supreme Court was objectively unreasonable in any of their conclusions, whether it's about the Olveda offense, whether it's about the bottle shop, whether it's about penalty, at that point under the law, if you find that the California Supreme Court was objectively unreasonable, then – then we're – then we take away the AEDPA deference when we're considering the rest of the case. But to your point, the strongest evidence and evidence that I think would be sufficient to justify a verdict would – you know, the gun is bad evidence. But I think, you know, ultimately, because courts have only found that shackling – that a shackling verdict where there's shackling that the jury is aware of, shackling that sends that message to the jury that this is a bad guy, that maybe the presumption of innocence doesn't apply quite as strongly to this person, the only cases where that's been upheld, and I think Mr. Ortega said this, are cases where the evidence was overwhelming, and I think it is – I think it is objectively unreasonable to say that the evidence is overwhelming if the jury took 5 days to sort things out, if 12 people have to sit around a table for 35 hours, not because they're being careful, but because the vote is divided, because some of them think this is a reasonable doubt case. I don't think that you can say – I don't think it's objectively reasonable to say in that situation that shackling has no reasonable probability of affecting an outcome. Okay. Thanks, counsel. I didn't mean to take you deeply into your colleague's time there. Thank you very much, Mr. Mayhew. Good morning. Good morning. Good morning. May it please the Court. Douglas Young, also for Apolli, Mr. Walker. At the penalty – I'm going to address the penalty phase issues here, and at the penalty phase, this jury was tasked with determining whether or not a 19-year-old with no prior criminal history, no prior history of violence or even an arrest, would live or die. And under the weighing statute in California, that required the jurors to engage in a delicate and subjective analysis, what the Supreme Court has called unquantifiable and elusive. What the Supreme Court has always said – has also said requires the jury to evaluate and attempt to know the heart and mind of the offender and judge his character and his contrition. That was the task before this jury, and as the State has conceded, and as Strickland and the other cases show, the issue is whether or not one juror might have voted differently, and if so, life without parole rather than death would have been the result for this teenager. Counsel, Judge Gould, if I could ask you a question on this to get to the heart of one of the things I was thinking about on penalty, and that's this. Let's say you have a case of overwhelming guilt, just assume that, and put aside the arguments your colleague made for a minute, but let's say that there's no question of guilt, you've got Jack the Ripper convicted and conclusive evidence that this person was Jack the Ripper, and now you have the only evidence on penalty that's presented is his mother gets up and says, well, yeah, he's Jack the Ripper, but he's been nice to me and he's only 19. Could a jury opt for mercy and life instead of death with that heavy aggravation and just the mother as mitigation? So could one juror do that, and would that mean he would not get death? I submit, Judge Gould, that yes, one juror could on those facts make that determination because, again, the penalty phase determination is different than the objective determination made at the guilt phase. This is kind of where we started with Judge Graber's question, and that's the difference in the analysis between guilt and penalty. Recognize that, if you will, Your Honor, that we have shown, the record reflects, and the State conceded this morning, that the shackle was uncomfortable, that it caused pain, and it caused distraction. That is one of the issues in the case law, and it affected his ability, the defendant's ability to concentrate and participate meaningfully in his own defense. The State has admitted that this morning, and that's significant. How does that go to the penalty phase, though, if he's distracted or not distracted? Because the jury is observing his demeanor throughout the trial, Your Honor, including at the penalty phase. And since assessments of character and remorse under Riggins, which we cited, may carry great weight and perhaps be determinative of whether an offender lives or dies, that's a significant factor. It can be. And I wonder, though, in this case, looking at the other side of the coin, where remorse is sort of not an option for him, where he's denying that he was there. If you follow my question, I guess it's not yet a question. But where the defense is, this is mistaken identity, I wasn't even there, I didn't do it, how can remorse even be a factor? Well, remorse is only one of the factors under Riggins. It's the defendant's demeanor and his overall demeanor that the jury is assessing. It's that unquantifiable and elusive thing that the jury is being asked to assess. They've already found he's a liar by not believing his denial, though. But again, what we know in the penalty phase is that they struggled on the penalty phase. They deliberated for 10 and a half hours over three days on penalty. The average jury in California deliberates 12 hours for an entire capital case, guilt and penalty. What this tells us, under the case law, case law tells us that a short deliberation may indicate overwhelming evidence. But a long deliberation indicates something else, and we can't determine for sure that this was an open and shut case. So on penalty, the length of the deliberation was important. And that was important in part because he was a teenager. This was not a close case for penalty. He was a teenager. We know that the jury struggled on the guilt phase over what may be the most critical issue on penalty, which is whether or not he was the one who actually pulled the trigger at the bottle shot. There is testimony that he had the gun and handed it to someone else. No one ever saw the gun handed back to Mr. Walker, and no one ever saw who pulled the trigger. And as we pointed out in our briefs, non-trigger people are rarely given the death penalty. So this was a significant and important issue at the penalty phase. In addition, as was pointed out, at penalty, the district attorney conceded that some of the evidence he was presenting was weak on the penalty issue, the identification by Ms. Olveda. The tape recordings of the jailhouse threat, the house threat that allegedly occurred, and the alleged threat on the district attorney, on those issues, by the way, Judge Graber, he did enjoy a presumption of innocence, because those were new to him at the penalty phase. The tape recording of the alleged jailhouse informant was lost, and the informant had his own issues. What's the burden of proof of the government of those additional facts that could be aggravators? Would the jury have to find, let's take the threat against the DA. There's no requirement of beyond a reasonable doubt, is there, for that? It was a beyond a reasonable doubt standard at that stage. And the DA, by the way, did not remember the threat. He remembered the words DA, but did not remember the threat. There was another witness who heard it that was present. So this case is probably more like Roche versus Davis out of the Seventh Circuit, where there was shackling throughout the trial. The court affirmed on guilt, but reversed on penalty, because things were in equipoise, and the shackle likely made a difference. Importantly here, Mr. Walker was shackled throughout the entirety of his trial. This is unlike other cases, Larson versus Palmateer or the Cox case, where the court made some effort to have the shackle removed at some stage, and certainly removed at the penalty stage. Here, the court made no effort. That was the fact in Cox. There was no shackling at the penalty phase? We don't have that here. The shackle was worn throughout. We know that the shackle caused him pain and was distracting. That was admitted. And it caused him to be in front of the jury, pulled out of the chair, and handcuffed behind his back. That was in front of the jury. The court made no efforts, which is normally ñ normally in these cases, the trial courts will make an effort to ensure that if there is a restraint, it is not visible to the jury either actually, Judge Silverman, or in terms of its effect on the defendant. In other words, if the defendant is going to testify, the jury is given a recess, the defendant goes to the stand, he testifies, the jury takes another recess, the defendant goes back. That was not done here. The judge made no effort. The jury saw him limp to the stand and from the stand, not once, not twice, but three times, the third time being at the penalty phase. And 30 years later, five jurors, as we pointed out, remember it very, very much. So this is not a case where the inherent bias from the shackle can or should be discounted. We submit that in assessing the most delicate, sensitive, and unquantifiable phase of the trial, where life or death hung in the balance, and the jury deliberated for a long time, indicating that it was a close case for them whether life or death would occur, the shackle was inherently prejudicial, and the determination of below should be affirmed. Would you mind going over with me what other mitigation there was besides his age and his lack of prior record? I believe his mother testified, and I think he had a sister who testified, and there were some other people who testified to his character. That he had supported them financially in. Yes. Counsel, are there any cases that shed light on the mental process that a panel like ours is supposed to go through to assess prejudice in a case like this on a guilt phase? Now, if the law is such that a 19-year-old who was definitely guilty of some multiple murders, like a Jack the Ripper, could be given mercy and life by a jury just because his mother likes him or his mother says he's a good son for me and he's only 19, then how are there cases that say how we are supposed to approach assessing whether one juror could have been swayed? I wish there were cases that would give you the framework, Judge Gould. I can't tell you, honestly, that there is one that says you look at these factors and these factors. That's why I think I submit that Deck and Riggins and the other Supreme Court cases call this a very difficult and delicate balance. I will suggest that Roche v. Davis, the Seventh Circuit case, is possibly on all fours in terms of its analysis of what could occur here and how this Court  Thank you, counsel. Procedural matter. Mr. Ortega mentioned the pinholster and that we shouldn't consider the certain portions of the stipulation. Do you have a comment on that? Maybe I should have asked Mr. Mayhew that as well. Well, I think it's footnote 4 of the State's brief where they concede there is no pinholes or issue here except for the three that he mentioned this morning. So you agree with the three, and it sounds like the State agrees with the rest. Well, the State, we agree with the three, except we really don't agree with the exact parameters of what he says about the specifics of the shackle. I believe that the stipulation and the testimony of Mr. Walker, which is in by stipulation although the State says they will contest it, is that it was a heavy locking brace, it cut into his knee and caused him pain, and that it weighed about 3 pounds. We think the record supports that, in particular, at least the effect of it cutting into his knee, because it's on the record that it caused him distraction. I'm not sure who it helps if we don't, if we ignore it, because I guess we can assume that it was either worse or better than it actually was. I mean, I'm not sure where it takes you to say we don't, we can't look at the specifics. I think that's true. Mr. Mayhew may have a comment on that. Mayhew, if I could make one more comment on the pinholster issue. If you end up saying, well, under pinholster we can only look at what the California Supreme Court had in front of it, and the California Supreme Court said they accepted the allegations as true, so this would be treated as a given as part of looking at whether they were objectively unreasonable. It was in the State court petition that it was a rigid locking device that caused him to assume an unnatural position throughout the trial, to sit in an unnatural position throughout the trial, and that the restraint caused Petitioner substantial discomfort all during the trial. So to the extent that you're looking for what did the State Supreme Court think about this shackle when they were making their prejudice determinations? Those allegations were before them, and they accepted them as true. Where do they accept it as true? Can you aim me in the direction of where they found those allegations true? By the California Supreme Court, when they say that the case is denied for no prima facie case, the California Supreme Court's precedents explain that no prima facie case means we are accepting the petition's allegations as true and then assessing whether there's enough that there might be a constitutional violation here that's worthy of further factual development or taking of evidence. Okay. I'm looking at the – I think we're talking about the same document, the Supreme Court order of September 30, 1992. The petition for rid of habeas corpus is denied on the merits as well as on procedural grounds. None of Petitioner's claims state a prima facie case for habeas corpus relief. And you're saying that that means that's their signal for they take everything as true. There's a second order from the California Supreme Court in 2004 where they specifically used the words no prima facie case. It was in, I think, December of 2004. Each claim is denied on the merits for failure to state a prima facie case for relief. Again, I'm asking you that that's – you understand that to be their code word for they take everything as true. Yes. And there's a California Supreme Court case that I can get the site for you. It indicates that that's the meaning of no prima facie case. It's People v. Duvall, 9 Cal 4th, 464, at 474 to 75. 9 Cal 4th. 464 at pages 474 to 475. And it says, An appellate court receiving a habeas petition evaluates it by asking whether, assuming the petition's factual allegations are true, the Petitioner would be entitled to relief. If no prima facie case for relief is stated, the Court will summarily deny the petition.  Mr. Ortega, back to you. Thank you. I agree with what Mr. Mayhew said about Duvall. That's what the California Supreme Court did in this case. It assumed the factual allegations as true and found that they didn't rise to a prima facie case merited relief. So that's why, under Harrington v. Richter, I'm saying we looked at what theories could have supported the California Supreme Court's decision, and I'm arguing that one of the theory the theory that supported it is that they found no prejudice from the deficient performance. I just want to clear up one thing about the shackle. What I am saying was not before the Supreme Court is on the excerpt of records page 40 that the shackle was a solid piece of molded plastic approximately 2 feet long and 1 1⁄8 inch to 1⁄4 inch thick, weighing about 3 pounds. The shackle was slid open on one side and fit to his leg by pulling the open side apart and placing it around his leg from the back so that the open sides abutted his kneecap. The shackle was secured via two large Velcro straps, one above and one below the knee. Those specifics were not before the Supreme Court, but I agree with Mr. Mayhew and the Petitioner, that we can infer from what was before the California Supreme Court that it was something like that, because it's clear in the record that his leg was straight, that he was forced to limp. And, in fact, Justice Silverman asked about what the jurors said, and did any of them say that they actually saw it. One juror said only, I saw the defendant wearing a leg restraint of some kind. Another juror said, one time when the defendant walked by us, I became aware that he was shackled with some kind of leg restraint, because of this restraint he had difficulty walking. Another juror said, the third juror said, I remember Defendant Walker walking funny at some point in the proceedings. I first thought he had hurt himself, but then realized he was wearing some kind of shackle. Juror four, during the trial, I saw the defendant, Marvin Walker, in the courtroom in leg restraints of some kind. They were leg irons of some sort, something visible around his legs. And the fifth and final declaration, I saw the defendant, Marvin Walker, wearing a leg restraint in the courtroom during the trial. He couldn't bend his knee properly and walked a little strange. The leg shackle was worn under his pants, so it was not showing, but the effect was visible when he walked. So that was what was before the California Supreme Court on the visibility question. And then, of course, as I mentioned, the entire jury became aware of it when it was announced to them that he had this. Counsel, Judge Gould, if I could ask you the same question I asked the appellee's lawyer on the penalty phase. That is, given that there seems to be a legal framework from the Supreme Court that anything can come in as mitigation. So the guy's mother saying, he's like a good son, that can be considered as mitigation. And given that only one juror can stop the death penalty, if that one juror insists on life, are there cases or is there a case that you would point us to that gives us what you think is the proper framework for us to assess prejudice under Strickland? I wish I did. I'm sorry, Judge, I interrupted. Yeah, that's all. I just, I'm wondering if the Supreme Court or our circuit has said anything that gives us a better approach than just sort of like I know it when I see it. I wish I had a case to point you to, Your Honor. I do not. All I can say is that what Your Honor articulated, I would concede a reasonable juror might have thought life without parole as opposed to death. The California Supreme Court concluded differently. The California Supreme Court here, I think, concluded the aggravating circumstances were so great that this jury would have, all 12 of these jurors would have returned death even if the shackle had not been there. So the question is, in my view, is, is that an objectively reasonable conclusion by the California Supreme Court? If it is, the district court is reversed. If it's not, the district court is affirmed on penalty. I don't know how else to answer, because we're in the Strickland context. All we have is the reasonable likelihood. Does it undermine confidence in the verdict? Is the penalty verdict, confidence in this penalty verdict undermined by the fact that Mr. Walker had this knee restraint on during the penalty phase? And one thing the Petitioner argued, which I, and with respect to both guilt and guilt, I concede that it did, but it's not necessarily the only reasonable conclusion is not that that means the jury didn't find the evidence overwhelming or the aggravating circumstances overwhelming. It seems to me an equally objectively reasonable conclusion, especially with respect to the guilt phase, is that this jury was conscientious. This jury was going through everything, asking about reasonable doubt, asking for reasonable doubt, asking for reasonable doubt, asking for reasonable doubt. That doesn't necessarily or only show that they didn't find the evidence overwhelming. I find that I'm just repeating myself. Let me ask you, I believe I asked Mr. Young about the mitigation. We have the age of the defendant, we have his no prior record, we have his, the love and affection of his mother and sister and his support of them. What was the aggravation? Can you repeat that? The aggravation was essentially four matters, one of which ultimately the California Supreme Court ruled should not have come in. That was the circumstances of the crime, right? The, as the Supreme Court called it, the execution style of two unresisting victims, the DA threat, and then the threat to off the officer that was heard from the undercover phone call, which the California Supreme Court ultimately concluded should not have come before the jury. So what the California Supreme Court called the overwhelming aggravation case was the circumstances of the crime. Now, one thing I, excuse me, Your Honor. Sure. Take your time. I'm sorry, Your Honor, I'm, I'm, I'm, I'm not well, I think, I hate to do this. Could, could I just submit the case? Sure, sure.
judges: Silverman, Graber, Gould